UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Michaels Stores, Inc.,            File No. 19-cv-01066 (ECT/BRT)

    Plaintiff,

v.                                      **OPINION AND ORDER**

Sun Life Assurance Company of Canada,

    Defendant.

_____

Mark W. Vyvyan, Jessica R. Sharpe, and Christian V. Hokans, Fredrikson & Byron, P.A., Minneapolis, MN, for Plaintiff Michaels Stores, Inc.

Aaron Mills Scott and Peter D. Stiteler, Fox Rothschild LLP, Minneapolis, MN for Defendant Sun Life Assurance Company of Canada.

---

Michaels Stores brought this case to obtain a declaration of its rights under a shopping-center lease with Sun Life Assurance Company of Canada. Under the lease, the extended absence of an "Anchor Tenant" from the shopping center gave Michaels the option to pay a lower monthly rent. The lease calls this "Alternative Rent." The issue is whether the lease may be understood to permit Michaels to exercise this option retroactively—here, more than two years after the option was triggered and after Michaels paid rent at the regular amount throughout that time—so that Michaels may recoup $254,583.05 of rent it paid to Sun Life. Sun Life argues that the lease cannot reasonably be interpreted this way, and it seeks dismissal of Michaels's complaint under Federal Rule of Civil Procedure 12(b)(6). Sun Life's motion will be granted because the interpretation of the lease Michaels advances is not reasonable and, therefore, not plausible.

I

The commercial lease that is the subject of this dispute is, like many commercial leases, lengthy and in some places relatively complex. It helps to start by describing several basic background facts and lease terms at a high level. Michaels entered the lease in 2004; the property that is the subject of the lease is retail space in a shopping center in Eden Prairie, Minnesota. Compl. ¶ 10 [ECF No. 1]; Compl. Ex. A [ECF No. 1-2 at 2–121]. (From this point, Exhibit A to the Complaint will be cited simply as "Lease," and unless otherwise specified, all citations are to Exhibit C to the Lease, entitled "General Lease Provisions." *See also* Lease § 17.11.). Sun Life later acquired the shopping center and assumed the role of landlord under the lease. Compl. ¶ 11; *see also* Lease § 17.2 ("Heirs, Successors and Assigns" clause). Relevant here, the lease contains an "On-Going Co-Tenancy" provision requiring that certain premises within the shopping center "be open and continuously operated by an Anchor Tenant." Compl. ¶ 12; Lease § 16.3. The lease defines "Anchor Tenant" by reference to several attributes one would expect of a large, well-known national or regional retail store. Lease § 16.3. If an Anchor Tenant is closed for 120 days and various other conditions are satisfied, then the lease gives Michaels the option to pay "Alternative Rent," an amount set at 3% of Michaels's gross sales for the preceding calendar month and intended to be less than Michaels's ordinary fixed monthly rent (which the lease calls "Minimum Rent"). *Id.*; *see also* Mem. in Opp'n at 2 [ECF No. 14] ("Co-tenancy clauses requiring that certain prime tenants stay in continuous operation are common in shopping center leases." (citing 1 Law of Real Estate Financing § 5:70)).

In late July 2016, an Anchor Tenant, Sports Authority, closed. Compl. ¶ 15 (alleging that Sports Authority closed "on or around July 28, 2016"); *see also Id.*, Ex. C [ECF No. 1-2 at 125] (attaching letters from Sun Life asserting that "Sports Authority vacated its space on July 31, 2016"). The Parties agree that Sports Authority's closure resulted in the non-satisfaction of the On-Going Co-Tenancy Requirement. Compl. ¶ 15; Mem. in Supp. at 2–3 [ECF No. 8]. Michaels alleges its "corporate real estate department became aware for the first time that the On-Going Co-Tenancy Requirement was not satisfied" in January 2019, Mem. in Opp'n at 2, and that Michaels wrote to Sun Life on January 14, 2019, declaring its intent to invoke the Alternative Rent option "effective July 28, 2016," Compl. Ex. B [ECF No. 1-2 at 123]. Up to that point, Michaels had continued to pay Minimum Rent for the two and a half years after the Anchor Tenant had closed and vacated the space, through and including January 2019. *Compl.* ¶ 16. Michaels sought to retroactively pay Alternative Rent for 14 months from November 2016 through December 2017 by offsetting amounts from future rent payments. *See* Compl. Ex. F [ECF No. 1-2 at 133]; Compl. Ex. B. In response, Sun Life asserted that Michaels was not entitled to pay Alternative Rent because it was "not credible that the Sports Authority closure had a material adverse effect on the Michaels store" and that "by waiting so long to respond to the closure, Michaels waived whatever rights it had under the Lease[.]" Compl. Ex. C; *see* Compl. ¶ 18. Michaels paid Minimum Rent for February and March 2019 but maintained that it was entitled to recover "any amounts overpaid . . . as a result of the non-satisfaction of the On-Going Co-Tenancy Requirement." Compl. Ex. E [ECF No. 1-2 at 129–31]; *see* Compl. ¶¶ 19–20.

Michaels brought this case in April 2019, seeking a declaration that it was entitled to pay Alternative Rent for at least 14 months, and thus was entitled to $254,583.05 in reimbursement (the asserted difference between the Minimum Rent it actually paid for November 2016 through December 2017 and the lower Alternative Rent it wishes to pay). *See* Compl. ¶¶ 21–26; Compl. Ex. F. There is diversity jurisdiction because the amount in controversy exceeds $75,000, and the Parties are of diverse citizenship. Michaels is a Delaware corporation with a principal place of business in Texas, and Sun Life is a Canadian corporation with its principal place of business in the United States in Massachusetts. Compl. ¶¶ 6–7.

II

A

Several settled legal rules govern consideration of Sun Life's Rule 12(b)(6) motion and interpretation of the lease. The complaint's factual allegations and reasonable inferences from those allegations must be accepted as true. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014). The complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "As this action is in federal court based on diversity of citizenship, state law governs substantive law issues." *Paine v. Jefferson Nat'l Life Ins. Co.*, 594 F.3d 989, 992 (8th Cir. 2010) (citation omitted); *see also Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). The Parties agree that Minnesota law governs here. *See* Mem. in Supp. at 3; Mem. in Opp'n at 11. The basis for this understanding can be found in the lease. It contains a choice-of-law clause specifying that the contract will be governed by and construed in accordance with the laws of the state in

which the Shopping Center is located. Lease § 17.3. Based on this provision and the fact that the Parties agree Minnesota law governs, Minnesota law will be applied here. *See Neth. Ins. Co. v. Main St. Ingredients, LLC*, 745 F.3d 909, 913 (8th Cir. 2014) ("Because the parties do not dispute the choice of Minnesota law, we assume, without deciding, Minnesota law applies . . . .").

As for the rules governing contract interpretation under Minnesota law, the Minnesota Supreme Court has said that:

> "[T]he primary goal of contract interpretation is to determine and enforce the intent of the parties." *Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.*, 666 N.W.2d 320, 323 (Minn. 2003). Interpretation of unambiguous contracts is a question of law for the court, as is the determination that a contract is ambiguous. *Denelsbeck v. Wells Fargo & Co.*, 666 N.W.2d 339, 346 (Minn. 2003). The terms of a contract are ambiguous if they are susceptible to more than one reasonable interpretation. *Id.* A contract's terms are not ambiguous simply because the parties' interpretations differ. *See id.* at 347 (concluding that the parties' dispute was due to conflicting interpretations of a contract's requirements, rather than the contract being ambiguous).

*Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.*, 913 N.W.2d 687, 692 (Minn. 2018). "If the court determines that the contract language is unambiguous—meaning it has only one reasonable interpretation—it will give effect to that language" and determine the parties' intent "from the language of the written contract alone." *Minn. Vikings Football Stadium, LLC v. Wells Fargo Bank, Nat'l Ass'n*, 193 F. Supp. 3d 1002, 1011 (D. Minn. 2016). "If the district court determines that a contract is ambiguous, it may admit parol, or extrinsic, evidence of the parties' intent." *Staffing Specifix, Inc.*, 913 N.W.2d at 692 (citations omitted). "Only if a preponderance of the evidence does not prove the parties'

5

intent should the [factfinder]" apply the canon of *contra proferentum* and "construe ambiguous terms against the drafter." *Id.* at 694.

Under Minnesota law, contract provisions are not to be read in isolation, but instead in light of their surrounding context. *RAM Mut. Ins. Co. v. Rohde*, 820 N.W.2d 1, 14 (Minn. 2012) ("[P]rovisions of a lease should never be interpreted in isolation, but rather in the context of the entire agreement." (citation and internal quotation marks omitted)). The Minnesota Supreme Court has several times criticized courts and parties for failing to heed context clues. *See, e.g.*, *Gill v. Gill*, 919 N.W.2d 297, 313 (Minn. 2018) ("The court's focus on scattered references in the purchase agreement . . . is far too simplistic and inconsistent with our historic approach to contract construction. . . . Words and phrases cannot be read 'out of context with the entire agreement.' (quoting *Metro Office Parks Co. v. Control Data Corp.*, 205 N.W.2d 121, 124 (Minn. 1973)); *Savela v. City of Duluth*, 806 N.W.2d 793, 801 (Minn. 2011) ("The intent of the parties is not ascertained by a process of dissection in which words or phrases are isolated from their context, but rather from a process of synthesis in which the words and phrases are given a meaning in accordance with the obvious purpose of the contract as a whole." (citation and internal quotation marks omitted)); *Sayer v. Minn. Dep't of Transp.*, 790 N.W.2d 151, 158 (Minn. 2010) (rejecting party's focus on one sentence "[r]ead in isolation," and concluding that reading the sentence "in context and in conjunction with the [contract] as a whole," the meaning was evident); *accord Owners Ins. Co. v. European Auto Works, Inc.*, 695 F.3d 814, 823 (8th Cir. 2012) (Colloton, J., dissenting) ("The italicized subsection (b), however, must be viewed in context. *Minnesota law is firm on this point.* . . . The Minnesota courts will not

consider the meaning of subsection (b) in isolation, but in the light of surrounding provisions." (emphasis added)). "'Because of the presumption that the parties intended the language used to have effect,' Minnesota courts 'will attempt to avoid an interpretation of the contract that would render a provision meaningless.'" *Qwinstar Corp. v. Anthony*, 882 F.3d 748, 755 (8th Cir. 2018) (quoting *Chergosky v. Crosstown Bell, Inc.*, 463 N.W.2d 522, 526 (Minn. 1990)).

B

Resolving the Parties' dispute requires interpreting one section of the lease labeled "16.3 <u>Failure of Other Required Lessees to Operate</u>." Lease § 16.3. The section is lengthy. The first two sentences of the section create and define the "On-Going Co-Tenancy Requirement"; that requirement obligates designated premises within the shopping center to be "open and continuously operated by an Anchor Tenant." *Id.* The section defines "Anchor Tenant" essentially to mean a tenant that "on a regional or national basis, operates under the same trade name at least twenty (20) high quality retail stores" falling into one of twelve identified classes. *Id.* The classes include, for example, "sporting good store[s]" and "full line department store[s]." *Id.* As described earlier, the Parties do not dispute that Sports Authority was an Anchor Tenant or that its closure in late July 2016 caused "non-satisfaction" of the On-Going Co-Tenancy Requirement.

The rest of § 16.3 describes the Parties' options if the On-Going Co-Tenancy Requirement is not satisfied. It reads as follows:

> If at any time after the Rental Commencement Date the On-Going Co-Tenancy Requirement is not satisfied, and such non-satisfaction continues for one hundred twenty (120) days . . .

7

> then Tenant will have the right to pay, in lieu of monthly Minimum Rent, a monthly amount equal to three percent (3%) of Tenant's gross sales for the preceding calendar month, as "Alternative Rent", but in no event shall such Alternative Rent exceed the Minimum Rent payable under this Lease for such month. If Tenant shall continue to pay Alternative Rent in excess of twelve (12) consecutive months, and for so long as such non-satisfaction of the On-Going Co-Tenancy Requirement shall continue, Tenant shall have the right to terminate this Lease by sixty (60) days' written notice delivered to Landlord. In the event Tenant continues to pay Alternative Rent and has not elected to terminate this Lease at such time due to the non-satisfaction of the On-Going Co-Tenancy Requirement, Landlord will have the right to demand by written notice delivered to Tenant on or before the last day of the fourteenth (14th) full calendar month following the initial non-satisfaction of the On-Going Co-Tenancy Requirement (the "Demand Notice") that Tenant do the following: either (i) terminate this Lease by thirty (30) day written notice delivered to Landlord within sixty (60) days after Tenant's receipt of Demand Notice or (ii) discontinue Alternative Rent and recommence the payment of Minimum Rent per Paragraph 6 of Basic Lease Provisions on the sixtieth (60th) day after Tenant's receipt of the Demand Notice. Upon any termination pursuant to this Section 16.3, the parties shall have no liability under this Lease for obligations arising after that date.

Lease § 16.3.

This provision cannot reasonably be understood to give Michaels the right to exercise its option to pay Alternative Rent in the way it seeks to do here—more than two years after the option was triggered and after Michaels paid rent at the regular amount throughout that time. Interpreting the provision that way would render useless certain demand rights the provision grants Sun Life. Michaels's exercise of its Alternative-Rent election for a period "in excess of twelve (12) consecutive months" triggers Sun Life's "right to demand" that Michaels either "terminate th[e] lease" or "discontinue Alternative

8

Rent and recommence the payment of Minimum Rent[.]" *Id.* Section 16.3 requires Sun Life to exercise these rights "by written notice delivered to Tenant on or before the last day of the fourteenth (14th) full calendar month following the initial non-satisfaction of the On-Going Co-Tenancy Requirement[.]" *Id.* Importantly, the period in which Sun Life might exercise its demand rights does not begin to run from the date Michaels begins to pay Alternative Rent, but from the date the On-Going Co-Tenancy requirement is not met. By delaying exercising its Alternative-Rent option until January 2019—which is more than 29 months after Sports Authority closed and more than 25 months after Michaels's right to pay Alternative Rent was triggered—Michaels would, if permitted, effectively deprive Sun Life of the ability to exercise its demand rights. That Michaels seeks a declaration permitting it to recoup 14 months' worth of Alternative Rent does not answer these concerns. If that limitation on Michaels's recovery effectively preserved Sun Life's right to demand that Michaels "discontinue Alternative Rent and recommence the payment of Minimum Rent," it does not preserve Sun Life's right to demand that Michaels terminate the lease. Also, Section 16.3 uses grammar contemplating the Alternative Rent option's exercise promptly, or in real time relative to the non-satisfaction of the On-Going Co-Tenancy Requirement. For example, § 16.3 describes Michaels's "right to pay, *in lieu of* monthly Minimum Rent," Alternative Rent based on the preceding month's gross sales. *Id.* (emphasis added). "In lieu of" is an idiom meaning "[i]n place of" or "instead of." *The American Heritage Dictionary of the English Language* (2019). It signals that on the day Michaels was to pay Minimum Rent (the first of the month, per § 3.2), Michaels *instead* "ha[s] the right to pay . . . Alternative Rent." Lease § 16.3. This language seems

incompatible with an understanding of § 16.3 that would give Michaels the right today to recoup amounts it paid already in 2016 and 2017. Consistent with this interpretation, the lease has a separate provision addressing the retroactive repayment of rent. *See* Lease § 12.4 (addressing "Abatement of Rent").

All of this is not to suggest that § 16.3 is free of potential ambiguities and interpretive challenges. For example, the precise relationship between Michaels's right to pay Alternative Rent and Sun Life's demand rights is not obvious. Consider one possible interpretation of how § 16.3 might have applied if (hypothetically) Michaels had exercised its Alternative Rent option immediately. Section 16.3 says that the right to pay Alternative Rent is triggered if the On-Going Co-Tenancy Requirement is not satisfied for 120 days. *Id.* Here, 120 days after July 28, 2016 was November 25, 2016. If Michaels continued to pay Alternative Rent "in excess of twelve (12) consecutive months," or past November 25, 2017, then Michaels had the right to terminate the lease by 60 days' notice to Sun Life. *Id.* If Michaels "continue[d] to pay Alternative Rent and ha[d] not elected to terminate th[e] Lease at such time," then Sun Life's demand rights would have been triggered. *Id.* As noted, § 16.3 established a deadline by which Sun Life would have been required to deliver written notice of the exercise of its demand rights: "on or before the last day of the fourteenth (14th) full calendar month following the initial non-satisfaction of the On-Going Co-Tenancy Requirement." *Id.* Again, if July 28, 2016 is considered the initial non-satisfaction of the On-Going Co-Tenancy Requirement, then the "last day of the fourteenth (14th) full calendar month following" that date is September 30, 2017. Understanding § 16.3 that way seems to create a problem because it would put Sun Life's deadline to serve

its notice of demand rights roughly two months before the date Sun Life's option to exercise those rights would have been triggered. The Parties did not face this situation, so it is not clear how they might argue § 16.3 should be applied to these circumstances. When asked about this issue at oral argument, Sun Life explained that, in its view, § 16.3 did not forbid it from notifying Michaels of its intent to exercise its demand rights before Michaels had paid Alternative Rent "in excess of twelve (12) consecutive months." Regardless, how § 16.3 might have been interpreted to apply in that hypothetical situation does not matter here. Michaels accepts that a proper interpretation of the lease must give meaning to Sun Life's "contracted-for" demand rights, Mem. in Opp'n at 7–8, and Michaels does not suggest that any drafting issue or ambiguity rendered Sun Life's demand rights meaningless from the start. Thus, that it may not be clear how § 16.3 might apply in some hypothetical circumstances does not mean the interpretation Michaels advocates in this case is plausible.

The Parties disagree regarding the significance of two cases interpreting Alternative-Rent provisions in leases to which Michaels was a party-tenant: *Regency Realty Grp., Inc. v. Michaels Stores, Inc.*, No. 12-10594, 2012 WL 954639 (E.D. Mich. Mar. 6, 2012), and *Michaels Stores, Inc. v. RPAI Lakewood, LLC*, 186 Wash. App. 1025 (Wash. Ct. App. 2015). *See* Mem. in Supp. at 6–7; Mem. in Opp'n at 8–9. Both cases address the scope of the landlords' termination rights and hold that "the [relevant lease] provision grants Landlord a onetime option to terminate Tenant at the end of the twelfth month following nonsatisfaction of the Co-Tenancy Requirement." *Regency Realty*, 2012 WL 954639, at *7; *see RPAI Lakewood*, 186 Wash. App. at **3–5. It is true that the issue

of the retroactivity of the landlords' termination rights in those cases resembles the issue in this case—whether Michaels may invoke its option to pay Alternative Rent retroactively. But the specific lease provisions considered in each of those cases seem materially different from the provision at issue here. The specific interpretive problem in both *Regency Realty* and *RPAI Lakewood* was whether use of the word "likewise" was intended to "indicate that Landlord's termination right is procedurally identical to Tenant's." *Regency Realty*, 2012 WL 954639, at *7; *RPAI Lakewood*, 186 Wash. App. at **3–4. Section 16.3 does not use "likewise" or any similar word to describe Michaels's Alternative-Rent option or Sun Life's demand rights. Given this distinction and other differences between the disputed lease terms in those cases and § 16.3, *Regency Realty* and *RPAI Lakewood* do not help to resolve the issue here.[1]

---

[1] Sun Life requests an award of "reasonable and necessary costs and attorneys' fees" as the "prevailing party" under Section 14.5 of the Lease. Mem. in Supp. at 11. Federal Rule of Civil Procedure Rule 54(d)(2)(A) says that generally "[a] claim for attorney's fees and related nontaxable expenses must be made by motion," and Rule 54(d)(2)(B) provides that "[u]nless a statute or court order provides otherwise, the motion must . . . state the amount sought or provide a fair estimate of it." *See also* LR 54.3(b). Sun Life's informal request for attorney's fees and costs will therefore be denied without prejudice to its right to file a motion in compliance with these and any other applicable rules.

## ORDER

Based upon all of the files, records, and proceedings in the above-captioned matter,

**IT IS ORDERED** that:

1. Defendant's Motion to Dismiss [ECF No. 6] is **GRANTED**; and

2. The Complaint [ECF No. 1] is **DISMISSED WITH PREJUDICE**.

   **LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: September 24, 2019        s/ Eric C. Tostrud
                                 Eric C. Tostrud
                                 United States District Court